USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit
 ____________________

No. 98-1730

 STEVEN G. COOPERMAN, ET AL.,

 Plaintiffs, Appellants,

 v.

 INDIVIDUAL INC., ET AL.,

 Defendants, Appellees.

 ____________________

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. Douglas P. Woodlock, U.S. District Judge]

 ____________________

 Before

 Torruella, Chief Judge,

 Stahl and Lynch, Circuit Judges.

 _____________________

 Robert P. Sugarman, with whom David J. Bershad, Janine L.
Pollack, Milberg Weiss Bershad Hynes & Lerach LLP, Glen DeValerio,
Jeffrey C. Block, Matthew E. Miller and Berman, DeValerio & Pease
LLP were on brief, for appellants.
 Brian E. Pastuszenski, with whom Stephen D. Whetstone, Robert
Noah Feldman and Testa, Hurwitz & Thibeault, LLP were on brief, for
appellee Individual Inc.
 Thomas J. Dougherty, with whom Matthew J. Matule, Skadden,
Arps, Slate, Meagher & Flom LLP were on brief, for appellee
Managing Underwriters.

 ____________________

 March 22, 1999
 ____________________ TORRUELLA, Chief Judge. Six plaintiffs, purchasers of
common stock of Individual, Inc. ("Individual" or "the Company"),
brought suit under sections 11 and 15 of the Securities Act of 1933
(the "1933 Act") against Individual, its board members, and the
underwriters who participated in Individual's March 1996 initial
public offering ("IPO"). Plaintiffs claim that defendants made
materially false and misleading statements and omitted material
facts in connection with the registration statement and prospectus
for the IPO. The focus of plaintiffs' claim is that defendants
improperly failed to disclose that, at the time the IPO became
effective, a conflict existed between Yosi Amram ("Amram") -- the
director, founder, chief executive officer and president of
Individual -- and a majority of the board of directors about the
strategic direction the company should take. The complaint alleges
that, as a result of this conflict, Amram left Individual, causing
the price of the Company's stock to fall sharply. It is claimed
that failure to disclose this conflict in the registration
statement and prospectus is an omission of a material fact which
renders defendants liable for the damages allegedly suffered.
 On April 15, 1997, defendants moved to dismiss
plaintiffs' claims for failure to state a claim. In a Memorandum
and Order dated May 27, 1998, the district court granted
defendants' motions in their entirety. This appeal followed.
I. BACKGROUND
 1. Individual's Business
 Individual is in the business of providing electronic
customized information services. The Company searches tens of
thousands of news sources each day and delivers to its customers
personalized packages of news stories by facsimile, e-mail, the
Internet, and other network systems. Individual serves enterprises
as well as individual users. The Company is supported primarily by
revenue from subscriptions paid by its users. Amram founded
Individual in 1989 and was largely responsible for its rapid growth
from a start-up to a public company. Until August 1996, Amram
served as a director, president and CEO of Individual.
 2. The Registration Statement and Prospectus
 On January 31, 1996, Individual publicly announced that
it had filed a registration statement with the Securities and
Exchange Commission ("SEC") for an initial public offering of 2.5
million shares of common stock. The SEC declared the registration
statement effective on March 15, 1996 and 2.5 million shares were
offered to the public at a price of $14 per share.
 Plaintiffs allege that at the time the registration
statement became effective
 there was a substantial disagreement between
 Amram . . . and a majority of the Board
 members . . . as to the strategic direction of
 the Company. Amram believed that the Company
 should grow and expand through rapid, often
 costly, acquisitions of new businesses. The
 majority of the Board, however, believed that
 Individual should grow through building its
 core business through, among other things, the
 growth of its subscriber base, the expansion
 of its information base and providers, and
 enhancement of its knowledge processing
 systems. Prior to the Offering, a majority of
 the Board was greatly concerned about, and
 firmly opposed to, Amram's growth through
 acquisition strategy.

The prospectus did not disclose the existence of any disagreement
between Amram and the majority of the Board. Instead, the
prospectus stated that the Company's future objective was "to build
the industry's leading 'open information exchange' . . . . [by]
enhanc[ing] its knowledge processing systems and expand[ing] its
base of participants." The description in the prospectus thus
mirrors the complaint's description of the majority of the Board's
strategy: growth through development of Individual's existing core
business.
 3. Post-Public Offering Developments
 The price of Individual's stock rose rapidly in the
period after the IPO due to the Company's announcements of new
strategic alliances with Microsoft and Toshiba. In addition, on
April 23, 1996, Individual announced its first quarter results, as
well as a 233% increase in its number of users. In the aftermath
of these announcements, Individual's stock price rose from $16 to
$20 per share in just three days -- a total increase of over
twenty-two percent.
 4. Amram's Departure
 On July 24, 1996, Individual announced that Amram was
taking an "indefinite leave of absence" from the Company due to a
disagreement with the Board over "the pace of acquisitions." 
Robert Lentz, Individual's CFO, explained that Amram wanted the
Company to move faster in making acquisitions and investments as
the Internet's popularity exploded. Immediately after the
announcement of Amram's leave, the price of Individual stock fell
37% from the previous day's close of $9.50 per share to $6 per
share.
 A July 25, 1996 Bloomberg News report confirmed that
Amram's departure was due to the fact that Amram wanted to augment
the speed and breadth of Individual's acquisitions and investments,
while the majority of the Board strongly opposed such a strategy. 
On July 30, 1996, then-acting chairman of Individual, William A.
Deveraux, also attributed Amram's departure to his frustration with
the Board's position that it was inappropriate to pursue venture
capital activities using Individual's funds and resources. 
Devereaux reiterated that the Board's plan, as described in the
prospectus, was to pursue strategically moderate deals, which could
easily be integrated into the Company's core business.
 On August 7, 1996, Amram issued a public statement that
he would resign as CEO in protest over the Board's actions during
the prior two weeks. According to the complaint, those actions
included his dismissal without notice after he informed other
directors of his plan to establish another company, "Free Spirit
Holdings," to invest in the entertainment, media and health care
industries. Amram planned to contribute 100,000 shares of
Individual stock to Free Spirit Holdings and wanted the Company to
contribute another 100,000 shares. The Board rejected this
proposal. At the end of the day, the Board announced that it had
terminated the employment of Amram, although he still remained a
member of the Board.
 The next day, on August 8, Amram announced that he had
quit his position with the Company but that he would fight to
regain leadership. On August 9, Richard Vancil, Individual's vice
president of marketing, explained Amram's departure: "There was a 
divergence of strategy. Yosi wanted rapid and multiple
acquisitions and the board was focusing on growing the core
business." Vancil further stated that "Amram's strategy was more
in line with a venture capital strategy."
 5. Proceedings Below
 In the proceedings below, plaintiffs claimed that
defendants' failure to disclose the conflict between Amram and the
majority of the Board at the time the IPO became effective violated
sections 11 and 15 of the 1933 Act. After concluding that the
complaint adequately alleged that such a conflict in fact existed
at the time of the IPO, the district judge found that: (1) the
alleged omission was material; and (2) although material, there was
no duty to disclose.
 On appeal, plaintiffs challenge the district judge's
conclusion that, as a matter of law, defendants were under no duty
to disclose the material fact of the Board-level dispute. 
Defendants challenge the district judge's threshold determination
that the allegations in the complaint "barely -- but sufficiently"
support an inference that the Board-level conflict existed as of
March 15, 1996 -- an essential element of plaintiffs' claim. 
Defendants also contest the district judge's determination of
materiality, claiming that, even if the alleged conflict existed as
of March 15, 1996, its omission was immaterial as a matter of law.
II. DISCUSSION
 1. Standard of Review
 We review the dismissal of plaintiffs' amended
consolidated complaint de novo. See Suna v. Bailey Corp., 107 F.3d
64, 68 (1st Cir. 1997). We accept as true all well-pleaded
allegations and give plaintiffs the benefit of all reasonable
inferences. See Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st
Cir. 1996). Dismissal under Fed. R. Civ. P. 12(b)(6) is only
appropriate if the complaint, so viewed, presents no set of facts
justifying recovery. See Dartmouth Review v. Dartmouth College,
889 F.2d 13, 16 (1st Cir. 1989).
 Section 11 imposes liability on signers of a registration
statement and on underwriters, among others, if the registration
statement, at the time it became effective, "contained an untrue
statement of a material fact or omitted to state a material fact
required to be stated therein or necessary to make the statements
therein not misleading." 15 U.S.C. 77k(a). Thus, to avoid
dismissal of their 11 claim, plaintiffs must successfully allege:
(1) that Individual's prospectus contained an omission; (2) that
the omission was material; (3) that defendants were under a duty to
disclose the omitted information; and (4) that such omitted
information existed at the time the prospectus became effective. 
See id.
 2. Standing
 We first address the threshold issue of standing. 
Defendants contend that plaintiffs lack standing to assert their
 11 claim. Specifically, defendants argue that 11 relief is
only available to those individuals who purchase their shares
directly through the IPO subject to the registration statement at
issue. According to the complaint, three of the six plaintiffs
did in fact purchase their shares directly through Individual's
March 15, 1996 IPO. Thus, even accepting defendants' argument,
these three plaintiffs would have standing to assert a 11 claim. 
In any event, because we are affirming the district court's
dismissal of the plaintiffs' 11 claims on other grounds, we need
not resolve the standing issue.
 3. The Existence of a Board-level Conflict as of
 March 15, 1996

 We next address defendants' claim that the complaint does
not adequately allege an essential element of plaintiffs' claim. 
Specifically, defendants argue that the uncontested fact that a
Board-level dispute about the strategic direction of the Company
existed in July 1996 is not enough to support the inference that
the conflict existed on March 15, 1996, the date the prospectus
became effective.
 As discussed above, in the context of a Rule 12(b)(6)
motion, the demands on the pleader are minimal. "Nevertheless,
minimal requirements are not tantamount to nonexistent
requirements." Gooley v. Mobil Oil Corp., 851 F.2d 513, 514 (1st
Cir. 1988). To survive a motion to dismiss, plaintiffs must set
forth "factual allegations, either direct or inferential,
respecting each material element necessary to sustain recovery
under some actionable legal theory." Id. at 515. This court has
previously plotted the dividing line between adequate "facts" and
inadequate "conclusions": "it is only when . . . conclusions are
logically compelled, or at least supported, by the stated facts,
that is, when the suggested inference rises to what experience
indicates is an acceptable level of probability, that 'conclusions'
become 'facts' for pleading purposes." Dartmouth Review, 889 F.2d
at 16. We thus examine plaintiffs' factual allegations to see if
they support the conclusions pled.
 Plaintiffs allege that the July 24, 1996 announcement of
Amram's decision to take a leave of absence -- just four and one-
half months after the IPO -- supports the "conclusion" that a
Board-level conflict existed at the time of the IPO. To further
support this conclusion, plaintiffs point to news reports published
on July 25, 1996, and August 9, 1996, attributing Amram's departure
to a "divergence of strategy" between Amram and the majority of the
Board. The July 25 report further suggested that the conflict
between Amram and the Board was not of recent origin: "It's hard to
make headway in a battle if the Company's direction is still a
matter of debate."
 Plaintiffs' factual allegations clearly support the
contention that a conflict between Amram and the Board existed in
July 1996. The more difficult question is whether these
allegations also support the inference that this conflict existed
as early as March 15, 1996.
 In Gross v. Summa Four, Inc., this court upheld the
dismissal of a securities complaint on the ground that references
in the minutes of a June 14 board meeting to delays in orders that
the company was receiving at that time did not support the
inference that the Company knew about those delays at the time of
its May 3 press release. See 93 F.3d at 995. The court emphasized
that the June 14 board meeting was held five weeks after the
company issued its May 3 press release. See id. Defendants argue
that, in light of Gross, plaintiffs' allegations of a conflict four
and one-half months after the IPO, cannot, as a matter of law,
support the inference that the conflict existed at the time of the
IPO.
 We disagree. We believe that the departure of the
president, CEO and founder of the Company -- just four and one-half
months after the IPO -- is fundamentally different from a delay in
customer orders, the situation presented in Gross. Our "experience
indicates," Dartmouth Review, 889 F.2d at 16, that Board-level
conflicts, like the one that existed in July 1996, "do not arise or
disappear overnight." Memorandum and Order at 21. We agree with
the district court that plaintiffs' suggested inference rises to
"an acceptable level of probability." Dartmouth Review, 889 F.2d
at 16.
 Moreover, although we recognize the strong public policy
against allowing discovery in securities cases filed without a
substantial factual basis, see Private Securities Litigation Reform
Act of 1995, 15 U.S.C. 78u, we are also mindful of the procedural
posture of this case: all discovery has been stayed pending
defendants' motion to dismiss. "[W]e cannot hold plaintiffs to a
standard that would effectively require them, pre-discovery, to
plead evidence." Digital, 82 F.3d at 1225. We thus affirm the
district court's finding that plaintiffs' complaint adequately
alleged the existence of a Board-level conflict as of March 15,
1996, the date the IPO became effective.
 4. Materiality of Omitted Fact
 We next address defendants' challenge to the district
judge's determination of materiality. Defendants argue that, even
if the conflict between Amram and the majority of the Board existed
at the time of the IPO, Individual's omission of this conflict from
the prospectus was immaterial as a matter of law.
 This court has delineated the boundaries of materiality
in the securities law context:
 The mere fact that an investor might find
 information interesting or desirable is not
 sufficient to satisfy the materiality
 requirement. Rather, information is
 "material" only if its disclosure would alter
 the "total mix" of facts available to the
 investor and "if there is a substantial
 likelihood that a reasonable shareholder would
 consider it important" to the investment
 decision.

Milton v. Van Dorn Co., 961 F.2d 965, 969 (1st Cir. 1992) (quoting
Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)). We agree
with the district court that it is substantially likely that
reasonable investors would consider the existence of a Board-level
conflict over the future direction of the Company important to
their investment decision.
 In reaching this conclusion, we are mindful of our role
in making determinations of materiality:
 Although materiality is a mixed question of
 law and fact which the trier of fact
 ordinarily decides . . . if the alleged
 misrepresentations or omissions are so
 obviously unimportant to an investor that
 reasonable minds cannot differ on the question
 of materiality [it is] appropriate for the
 district court to rule that the allegations
 are inactionable as a matter of law.

In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 369 n.13 (3d
Cir. 1993) (internal quotation marks and citations omitted). We
cannot characterize the conflict between Amram and the Board as
"obviously unimportant" to a reasonable investor.
 5. Duty to Disclose
 Given our determination that the omission of the alleged
Board-level conflict was material, the question remains whether
defendants had a duty to disclose this "material fact" in the
Company's registration statement.
 In Digital, this court reiterated the well-settled
proposition that "the mere possession of material nonpublic
information does not create a duty to disclose it." Digital, 82
F.3d at 1202. Although in the context of a public offering there
is a strong affirmative duty of disclosure, it is clear that an
issuer of securities owes no absolute duty to disclose all material
information. See id. The issue, rather, is whether the securities
law imposes on defendants a "specific obligation" to disclose
information of the type that plaintiffs claim was omitted. Id. at
1202. We thus look to the explicit language of section 11 to
determine whether it imposes on defendants a "specific obligation"
to disclose the Board-level conflict that allegedly existed on
March 15, 1996.
 The Digital court set out the circumstances in which
section 11 imposes a duty of disclosure:
 Section 11 by its terms provides for the
 imposition of liability if a registration
 statement, as of its effective date: (1)
 "contained an untrue statement of material
 fact"; (2) "omitted to state a material fact
 required to be stated therein"; or (3) omitted
 to state material fact "necessary to make the
 statements therein not misleading."

Digital, 82 F.3d at 1204 (quoting 15 U.S.C. 77k(a)). Plaintiffs
base their claim of nondisclosure on the second and third prongs of
the statute. Specifically, plaintiffs claim that: (1) the
existence of the Board-level conflict was a material fact required
to be stated therein; and (2) disclosure of the Board-level
conflict was necessary to make other statements in the registration
statement not misleading.
 Plaintiffs base their first argument on Regulation S-K,
Item 101(a), which identifies some of the information "required to
be stated" in registration statements. See 17 C.F.R. 229.101(a). 
Item 101(a) requires an issuer, in the context of an IPO, to
"[d]escribe the general development of the business of the
registrant." 17 C.F.R. 229.101(a). Plaintiffs argue that Item
101(a) by its terms "required" the disclosure of the alleged Board-
level dispute as to the development of Individual's business. 
Plaintiffs raise this argument for the first time in a footnote of
their appellate brief. By failing to raise the applicability of
Item 101(a) in the district court, plaintiffs have waived this
argument. "Our law is clear that a party ordinarily may not raise
on appeal issues that were not seasonably advanced (and, hence,
preserved) below." See Daigle v. Maine Medical Center, Inc., 14
F.3d 684, 687 (1st Cir. 1994). We thus turn to plaintiffs' second
argument.
 This argument is to the effect that defendants had a
"specific obligation" to disclose the Board-level conflict because
its omission rendered affirmative statements in the registration
statement misleading. In making this argument, plaintiffs point to
two sections of the registration statement: (1) the "business
model" section, and (2) the "use of proceeds" section.
 The "business model" section of the prospectus states
that the Company's objective is:
 to build the industry's leading 'open
 information exchange' linking a growing base
 of knowledge workers to relevant information
 providers and advertisers. The Company
 believes that the value of this exchange will
 increase as the Company enhances its knowledge
 processing systems and expands its base of
 participants. An expanding set of information
 providers will make the services more
 compelling for knowledge workers. A larger
 user base will generate additional readership
 and revenues for information providers. 
 Increased participation of advertisers, who
 benefit from a larger user base and a growing
 number of information topics, will help to
 reduce subscription costs, leading to further
 expansion of the Company's user base.

 . . .

 The Company believes the mutually reinforcing
 dynamics of its business model are key to
 sustaining its growth and meeting its
 strategic objectives.

Plaintiffs argue that this statement is materially misleading
because it fails to disclose that, at the time the statement was
made, Individual's "business model" was the subject of profound
disagreement between Amram and the majority of the Board. Indeed,
according to the complaint, Amram's growth through acquisition
strategy was directly contrary to the Company's stated "business
model" of growing the Company by developing its existing core
business. Even accepting these allegations as true -- as we must
on a motion to dismiss -- we conclude that the omission of the
conflict between Amram and the Board does not render the "business
model" section of the prospectus misleading.
 In short, the "business model" section of the prospectus,
taken as a whole, is true. According to plaintiffs' complaint, the
majority of the Board was committed to growing the Company by
building on its existing core business. Disclosure of the
business strategy supported by a majority of the directors did not
obligate defendants also to disclose information about the extent
to which each individual Board member supported that model. Cf.Backman v. Polaroid, 910 F.2d 10, 16 (1st Cir. 1990) ("[E]ven a
voluntary disclosure of information that a reasonable investor
would consider material must be 'complete and accurate.' This,
however, does not mean that by revealing one fact about a product,
one must reveal all others that, too, would be interesting, market-
wise."). More specifically, disclosure of the business strategy
supported by the majority of the Board did not obligate defendants
also to disclose the fact that Amram -- a distinct minority of a
multi-member Board -- opposed that strategy. Cf. id.
 The "use of proceeds" section of Individual's prospectus
states that a portion of the net proceeds from the IPO will be used
for "general corporate purposes," as well as "the acquisition of
businesses, services and technologies that are complementary to
those of the Company." Plaintiffs argue that this statement is
misleading because it fails to disclose that, at the time the
statement was made, Amram and the Board could not agree on what
acquisitions were "complementary to those of the Company" nor on
the pace at which such acquisitions should be made. We conclude
that the omission of Amram's conflict with the majority of the
Board did not render the "use of proceeds" section misleading. 
Like the "business model" section, the "use of proceeds" section of
the prospectus is complete and accurate on its face. 
 First, disclosure of the majority of the Board's
intention to use the IPO proceeds for complementary acquisitions
did not obligate defendants also to disclose Amram's different
views concerning the types of acquisitions Individual should
pursue. Cf. Backman, 910 F.2d at 16. Second, the Company's
adherence to the purpose stated in the "use of proceeds" section
rendered that section accurate. Indeed, the complaint alleges that
Amram resigned due to the Board's summary rejection of his proposal
that the Company contribute 100,000 shares of Individual stock to
Free Spirits Holdings, a non-complementary business combination
that Amram planned to establish.
 In sum, both the "business model" section and the "use of
proceeds" section were complete and accurate. Because the omission
of the Board-level conflict did not render either section
misleading, we agree with the district court that 11 did not
impose on defendants a duty of disclosure.
 6. Section 15
 Section 15 of the 1933 Act establishes joint and several
liability for "controlling persons"--that is, those who exercise
control over primary violators of 11. 15 U.S.C. 770. A
necessary element of a 15 claim is a primary violation of 11. 
See, e.g., SEC v. First Jersey Securities, Inc., 101 F.3d 1450,
1472 (2d Cir. 1996). Because plaintiffs have failed to state a
claim for such a primary violation, they have also failed to state
a claim under 15. See Berliner v. Lotus Dev. Corp., 783 F. Supp.
708, 712-13 (D. Mass. 1992).
III. CONCLUSION
 For the reasons stated above, we affirm the district
court's dismissal of plaintiffs' complaint for failure to state a
claim.